JUDGMENT

============================================================

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

- - - - - - - - - - - - - -

NO. 01-57095
CT/AG#: CV-99-03829-HLH

BROTHER RECORDS, INC., a California Corporation

       Plaintiff-counter-defendant - Appellee

  v.

ALAN JARDINE, an individual

       Defendant-counter-claimant - Appellant

- - - - - - - - - - - - - - - - - - - -

APPEAL FROM the United States District Court for the
Central District of California, Los Angeles .

THIS CAUSE came on to be heard on the Transcript of the
Record from the United States District Court for the
Central District of California, Los Angeles
and was duly submitted.

ON CONSIDERATION WHEREOF, It is now here ordered and
adjudged by this Court, that the judgment of the said
District Court in this cause be, and hereby is  AFFIRMED.

Filed and entered        January 28, 2003

LODGED
CLERK, U.S. DISTRICT COURT
MAR 3 1 2003
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
APR - 1 2003
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only



ENTERED ON ICMS
APR 3 2003
CV



A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

MAR 2 8 2003

by: _____
Deputy Clerk

286

INTERNAL USE ONLY: Proceedings include all events.....
01-57095 Brother Records, Inc v. Jardine

BROTHER RECORDS, INC., a
California Corporation
        Plaintiff-counter-
defendant - Appellee

Edwin F. McPherson, Esq.
310-553-8833
24th Floor
[COR LD NTC ret]
McPHERSON AND KALMANSOHN
1801 Century Park East
Los Angeles, CA 90067

Michael J. Flynn, Esq.
FAX 858-793-4912
858-793-4900
Suite 202B
[COR LD NTC ret]
FLYNN, SHERIDAN & STILLMAN
3702 Via Del La Valle
Del Mar, CA 92014

Phillip H. Stillman, Esq.
FAX 858/793-4912
858/793-4900
Suite 115E
[COR LD NTC ret]
FLYNN & STILLMAN
3790 Via de la Valle
Del Mar, CA 92014

        v.

ALAN JARDINE, an individual
        Defendant-counter-
claimant - Appellant

Jeffrey S. Benice, Esq.
FAX 949/261-7915
949/261-7863
Suite 200
[COR LD NTC ret]
JEFFREY S. BENICE ATTORNEY AT
LAW
A Professional Law Corporation
8 Corporate Park
Irvine, CA 92606

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BROTHER RECORDS, INC., a
California Corporation,
             *Plaintiff-counter-*
             *defendant-Appellee,*

v.

ALAN JARDINE, an individual,
             *Defendant-counter-*
             *claimant-Appellant.*

No. 01-57095

D.C. No.
CV 99-03829 HLH

OPINION

Appeal from the United States District Court
for the Central District of California
Harry L. Hupp, District Judge, Presiding

Argued and Submitted
November 6, 2002—Pasadena, California

Filed January 28, 2003

Before: Harry Pregerson, John T. Noonan, and
A. Wallace Tashima, Circuit Judges.

Opinion by Judge Tashima

---

## SUMMARY

---

### Intellectual Property/Trademarks

The court of appeals affirmed a judgment of the district
court. The court held a defendant may not be entitled to the
nominative fair use defense to trademark infringement when

the defendant's promotional materials display the plaintiff's
trademark prominently and boldly, suggesting sponsorship by
the plaintiff; the defendant uses the plaintiff's trademark to
suggest sponsorship by the plaintiff; and the defendant's use
of the trademark causes actual consumer confusion.

In 1967, members of the popular music group The Beach
Boys, including appellant Alan Jardine, incorporated appellee
Brother Records, Inc. (BRI) to hold and administer the intel-
lectual property rights for The Beach Boys. BRI was the reg-
istered owner of "The Beach Boys" trademark. In 1998,
Jardine began touring with his own band, performing as
"Beach Boys Family and Friends." BRI informed Jardine that
his unlicensed use of the trademark would be an infringement.
Jardine and his band continued to perform using names that
prominently and boldly included "The Beach Boys" trade-
mark. The performances were promoted under names such as:
Al Jardine of the Beach Boys and Family and Friends; The
Beach Boys Family and Friends; Beach Boys Family and
Friends; The Beach Boys, Family and Friends; Beach Boys
and Family; as well as, simply, The Beach Boys. Jardine and
his band performed in locations and on dates close to licensed
Beach Boys shows. With two bands touring as The Beach
Boys or as a similar-sounding combination, show organizers
sometimes were confused about what exactly they were get-
ting when they booked Jardine's band. A number of show
organizers booked Jardine's band thinking they would get The
Beach Boys along with special added guests, but subsequently
canceled the booking when they discovered that Jardine's
band was not what they thought it was. Numerous people who
attended one of Jardine's shows said that they had been con-
fused about who was performing. BRI filed a complaint in
district court alleging that Jardine was infringing its trade-
mark. The district court granted summary judgment in favor
of BRI and issued a permanent injunction against Jardine's
use of the trademark.

Jardine appealed, contending that his use of BRI's trademark was protected by either the classic fair use doctrine or the nominative fair use doctrine.

[1] The nominative fair use analysis is appropriate where a defendant has used the plaintiff's mark to describe the plaintiff's product, even if the defendant's ultimate goal is to describe his own product. Conversely, the classic fair use analysis is appropriate where a defendant has used the plaintiff's mark only to describe his own product, and not at all to describe the plaintiff's product.

[2] The classic fair use defense, codified in the Lanham Act, 15 U.S.C. § 1115(b)(4), applies only to marks that possess both a primary meaning and a secondary meaning—and only when the mark is used in its primary descriptive sense rather than its secondary trademark sense. [3] Jardine did not use the trademark in any primary, descriptive sense. That is, Jardine did not use "The Beach Boys" trademark to denote its primary, descriptive meaning of "boys who frequent a stretch of sand beside the sea." Instead, Jardine used "The Beach Boys" trademark in its secondary, trademark sense, which denoted the music band and its members. Because Jardine did not use the mark in its primary, descriptive sense, the classic fair use defense did not apply.

[4] Where the defendant uses the trademark not in its primary, descriptive sense, but rather in its secondary, trademark sense, the nominative fair use analysis applies. The nominative fair use defense is available only if the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one. [5] The three requirements of the nominative fair use defense are, first, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark,

1284      BROTHER RECORDS, INC. V. JARDINE

suggest sponsorship or endorsement by the trademark holder. It was virtually impossible to refer to the Beach Boys without using the trademark, so Jardine met the first requirement. Also, because BRI did not allege that Jardine used anything that was not needed to identify the Beach Boys, Jardine satisfied the second requirement.

[6] Jardine failed, however, to meet the third requirement. Jardine's promotional materials displayed "The Beach Boys" more prominently and boldly than "Family and Friends," suggesting sponsorship by the Beach Boys. Also, Jardine used "The Beach Boys" trademark to suggest that his band was in fact sponsored by the Beach Boys. Finally, Jardine's use of the trademark caused actual consumer confusion.

[7] Because Jardine's use of the trademark suggested sponsorship or endorsement by the trademark holder, Jardine's nominative fair use argument failed. The entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. No genuine issue of material fact existed regarding Jardine's suggestion of sponsorship or endorsement by BRI. The district court's grant of summary judgment in favor of BRI had to be affirmed.

---

## COUNSEL

Jeffrey S. Benice, Irvine, California, for the defendant-counter-claimant-appellant.

Phillip H. Stillman, Del Mar, California, for the plaintiff-counter-defendant-appellee.

---

## OPINION

TASHIMA, Circuit Judge:

Alan Jardine appeals the district court's grant of summary judgment in favor of Brother Records, Inc. ("BRI"), on BRI's Lanham Act, 15 U.S.C. §§ 1051-1129, trademark infringement action alleging that Jardine infringed BRI's "The Beach Boys" trademark. Jardine also appeals the district court's grant of summary judgment in favor of BRI on Jardine's counterclaims that BRI breached a lifetime employment agreement and license agreement. Finally, Jardine appeals the district court's denial of his motion to amend his counterclaim to add third-party claims and an additional counterclaim. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

In 1961, Al Jardine, Mike Love, Brian Wilson, Carl Wilson, and Dennis Wilson formed The Beach Boys. The band shortly thereafter achieved huge commercial success, producing numerous hit songs and touring to huge audiences throughout the country. In 1967, the members of the Beach Boys incorporated BRI to hold and administer the intellectual property rights for The Beach Boys. Currently, BRI is equally owned by four shareholders, who are also its directors: Al Jardine, Mike Love, Brian Wilson, and the estate of Carl Wilson. BRI is the registered owner of "The Beach Boys" trademark.

Over the years, personal difficulties arose between some of the members, and some members of the band decided to not tour full time, or at all. In 1991, the members of the Beach Boys incorporated Brother Tours, Inc., which handled their touring and distributed their touring income. In 1993, the directors of BRI agreed to devote a certain percentage of the touring income to the corporation for use of the trademark and designated a larger percentage of the income to those members who actually toured. By 1998, Carl Wilson had died,

Love and Jardine no longer wanted to tour together, and Brian Wilson did not want to tour at all. Love began negotiating with BRI the terms of a license to use "The Beach Boys" trademark in connection with his own band.

BRI's directors met on July 14, 1998, to discuss how the trademark should be used. The representative of Carl Wilson's estate suggested that BRI issue non-exclusive licenses to each shareholder on the same terms and conditions as the license that was being negotiated with Love, thus giving each member an equal right to tour. Three of the four board members, including Jardine, voted to grant each Beach Boy a non-exclusive license. On October 1, 1998, BRI executed a non-exclusive license agreement with Love (the "Love license"). The Love license contained clauses designed to protect the value of the trademark, requiring the licensee to preserve The Beach Boys style and to choose from a list of approved booking agencies and managers.

The parties dispute whether BRI and Jardine entered into a non-exclusive license agreement. After the July 1998 BRI board meeting, Jardine began touring with his own band, using a booking agent and manager that were not included in the list approved by the Love license. On October 25, 1998, Jardine's attorney sent BRI a letter saying that Jardine would be performing as "Beach Boys Family and Friends," and that therefore, "a license from BRI [was] unnecessary." On October 28, 1998, BRI told Jardine that his unlicensed use of the trademark would be an infringement.

Jardine then proposed a license that included terms different from those included in the Love license. Jardine's proposal contemplated only a five-percent royalty to BRI on the first $1 million of gross receipts and a 17.5 percent royalty thereafter. BRI proposed a 17.5 percent royalty across the board. Love's license required a royalty of 20 percent of the first $1 million and 17.5 percent of receipts thereafter. Also, Jardine wanted to use a booking agent and manager that were

not on the approved list. Jardine stated that, whether or not BRI accepted the proposal, he would continue performing as the "Beach Boys Family and Friends."

The BRI board scheduled another meeting for November 24, 1998 to discuss Jardine's proposal. Before the meeting, Jardine's attorney sent a letter to the board with a proposed license agreement signed by Jardine. At the meeting, the BRI board voted to reject Jardine's proposal. In the months following the meeting, Jardine both attempted to negotiate an agreement and claimed he had a license.

Jardine and his band continued to perform using names that included "The Beach Boys" trademark. The performances were promoted under names such as: Al Jardine of the Beach Boys and Family & Friends; The Beach Boys "Family and Friends"; Beach Boys Family & Friends; The Beach Boys, Family & Friends; Beach Boys and Family; as well as, simply, The Beach Boys. Jardine and his band performed in locations and on dates close to Love's "The Beach Boys" shows. With two bands touring as The Beach Boys or as a similar-sounding combination, show organizers sometimes were confused about what exactly they were getting when they booked Jardine's band. A number of show organizers booked Jardine's band thinking they would get The Beach Boys along with special added guests, but subsequently canceled the booking when they discovered that Jardine's band was not what they thought it was. Numerous people who attended one of Jardine's shows said that they had been confused about who was performing. During this time period, BRI sent Jardine cease and desist letters objecting to Jardine's use of the trademark.

On April 9, 1999, BRI filed its complaint in the district court alleging that Jardine was infringing its trademark. Jardine answered, asserting the defenses of fair use, laches, estoppel, and unclean hands, and counterclaimed for breach of employment agreement, breach of license agreement, and for

a declaratory judgment that Jardine could tour as the "Beach Boys Family and Friends." On March 28, 2000, the district court issued the preliminary injunction prohibiting Jardine from using "The Beach Boys," "The Beach Boys Family and Friends," and other similar combinations, but still allowing Jardine to refer to his past membership in the band "in a descriptive fashion."

On March 19, 2001, two weeks before the close of discovery, Jardine moved for leave to amend his pleading to add third-party claims against the shareholders and directors of BRI and an additional counterclaim against BRI for breach of fiduciary duty. The district court denied the motion. On June 4, 2001, BRI moved for summary judgment on its trademark infringement claim and Jardine's counterclaims. The district court granted summary judgment in favor of BRI and issued a permanent injunction against Jardine's use of the trademark. This timely appeal followed.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1139-40 (9th Cir. 2002). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact that remain for trial and whether the district court correctly applied the relevant substantive law. *Id.* at 1140. "Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Id.* (quoting *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999)). "Therefore, a district court may grant summary judgment and we may uphold a grant of summary judgment only if no genuine issue exists regarding likelihood of confusion." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002).

## DISCUSSION

### I.  Trademark Infringement

[1] Jardine contends that his use of BRI's trademark is protected by either the classic fair use doctrine or the nominative fair use doctrine. In *New Kids on the Block v. News Am. Publ'g Inc.*, 971 F.2d 302 (9th Cir. 1992), we noted that the classic fair use defense could not be applied in that case because "this is not the classic fair use case where the defendant has used the plaintiff's mark to describe the defendant's own product." *Id.* at 308. We then held that, "where the defendant uses a trademark to describe the plaintiff's product, rather than its own . . . a commercial user is entitled to a nominative fair use defense." *Id.* In *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150-52 (9th Cir. 2002), we reiterated the distinction between the classic fair use and nominative fair use doctrines.

> The nominative fair use analysis is appropriate where a defendant has used the plaintiff's mark to describe the plaintiff's product, even if the defendant's ultimate goal is to describe his own product. Conversely, the classic fair use analysis is appropriate where a defendant has used the plaintiff's mark only to describe his own product, and not at all to describe the plaintiff's product.

*Id.* at 1152.

To illustrate this distinction, we cited a number of cases that applied the nominative fair use analysis. *See id.* For example, in *New Kids*, the defendant newspapers used the New Kids trademark to refer to the music band New Kids itself in order to describe the defendants' own telephone polls about the band. *New Kids*, 971 F.2d at 308. *See Cairns*, 292 F.3d at 1151-52. In *Volkswagenwerk AG v. Church*, 411 F.2d 350 (9th Cir. 1969), the defendant car repair shop used the

plaintiff's trademarked name "Volkswagen" in a sign that said "Modern Volkswagen Porsche Service." *Id.* at 351. In *Smith v. Chanel, Inc.*, 402 F.2d 562 (9th Cir. 1968), a seller of imitation perfumes advertised its "2d Chance" perfume as indistinguishable from the trademarked "Chanel No. 5" perfume. *Id.* In *WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42 (1st Cir. 1991), a television station referred to and made broadcasts of the trademarked "Boston Marathon." *Id.* at 44. In all these cases, the defendant used the plaintiff's trademark to refer to the plaintiff's product, and therefore the nominative fair use analysis applied.

Following *New Kids*, we have applied the nominative fair use defense in a number of cases. In most of these cases, the nominative fair use defense, as opposed to the classic fair use defense, clearly applied because the defendant used the plaintiff's mark undeniably to refer to the plaintiff's product, even though the defendant's ultimate goal was to describe his own product. In *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407 (9th Cir. 1996), the defendant automobile manufacturer referred to plaintiff, a basketball star who had won an award three years in a row, in a commercial for a car that also had won an award three years in a row. *Id.* at 409. In *Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001), the defendant clothing company used the trademarked names and photograph of plaintiffs, surfing champions, to market shirts copied from those worn by plaintiffs in the photograph. *Id.* at 1000, 1009. These were not cases in which the defendant used the plaintiff's mark only to describe the defendant's own product, and not at all to describe the plaintiff's product. *See Cairns*, 292 F.3d at 1151 (explaining when classic fair use analysis applies). Rather, these were cases in which the defendant used the plaintiff's mark to describe the plaintiff's product — Kareem Abdul-Jabbar himself and the surfing champions themselves — even though the ultimate goal was to describe the defendant's own product. *See id.* (explaining when nominative fair use analysis applies).

We also have applied the nominative fair use analysis where the plaintiff's trademark was also the defendant's title. In *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002), plaintiff Playboy sued the defendant, who was Playboy Playmate of the Year in 1981, for her use of that trademarked title on her own website, which offered information about her and free photographs of her, advertised photographs for sale and membership in her photo club, and promoted her services as a spokesperson. *Id.* at 799. We explained in *Cairns* that the classic fair use analysis did not apply in *Playboy* because Welles had not used the Playboy mark "only to describe [her] own product, and not at all to describe the plaintiff's product." *Cairns*, 292 F.3d at 1152 & n.10. Although Welles arguably also used the mark to describe herself in the first instance — as she herself was indeed Playboy Playmate of the Year in 1981 — the fact that Welles used Playboy's mark to describe Playboy's product at all precluded the application of the classic fair use analysis. *See id.*

Here, Jardine argues that either the classic fair use *or* the nominative fair use defense applies. As in *Playboy*, whether the defendant's use of the mark refers to the plaintiff's product at all — and thus whether classic fair use analysis or nominative fair use analysis applies — is not clear. Jardine illustrates this point with his conflicting arguments (1) that his use of "The Beach Boys" mark describes the Beach Boys' product, thus requiring application of the nominative fair use analysis, and (2) that, in the alternative, his use of "The Beach Boys" mark describes only himself — a founding member of the Beach Boys — and not at all to describe the Beach Boys' product, thus requiring application of the classic fair use analysis. Where the defendant uses his or her own title, which happens also to be plaintiff's trademark, defendant can argue convincingly both that the use refers to defendant and that the use refers not at all to defendant. In these situations, the reference-to-trademark-holder distinction often proves more frustrating than helpful.

[2] Rather than contorting ourselves into finding either that Jardine used "The Beach Boys" mark to describe the Beach Boys or that Jardine used "The Beach Boys" mark only to describe himself and not at all to describe the Beach Boys, we analyze each defense separately. We note first that the classic fair use defense, codified in the Lanham Act, 15 U.S.C. § 1115(b)(4), applies only to marks that possess both a primary meaning and a secondary meaning — and only when the mark is used in its primary descriptive sense rather than its secondary trademark sense.[1] *See Cairns*, 292 F.3d at 1150-51 ("Under the common law classic fair use defense . . . '[a] junior user is always entitled to use a descriptive term in good faith in its primary, descriptive sense other than as a trademark.' ") (quoting 2 J. Thomas McCarthy, *McCarthy on Trademark and Unfair Competition* § 11:45 (4th ed. 2001));

---

[1]The law conceptually classifies trademarks along a spectrum of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 768 (1992); *Interstellar Starship Servs.*, 304 F.3d at 943 n.6; *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999). A descriptive mark "directly describes something about the goods or services in connection with which it was used as a mark." J. Thomas McCarthy, *McCarthy's Desk Encyclopedia of Intellectual Property*, 119 (2d ed. 1995); *Brookfield Communications, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 n.19 (9th Cir. 1999). "Although descriptive terms generally do not enjoy trademark protection, a descriptive term can be protected provided that it has acquired 'secondary meaning' in the minds of consumers, i.e., it has become distinctive of the trademark applicant's goods in commerce." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n.3 (9th Cir. 2002) (quoting *Park 'N Fly v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). *See* 15 U.S.C. § 1052(f) (permitting registration of marks that have become "distinctive of the applicant's goods in commerce"); 15 U.S.C. § 1053 (applying same requirement to registration of service marks). Similarly, a suggestive mark "conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature," and therefore carries both a primary descriptive meaning and a secondary trademark meaning. *Brookfield Communications*, 174 F.3d at 1058 n.19 (citing "Roach Motel" insect trap as an example); *Entrepreneur Media*, 279 F.3d at 1142.

*accord Park 'N Fly*, 469 U.S. at 201 ("The Lanham Act, . . . under certain circumstances, permits the nontrademark use of descriptive terms contained in an incontestable mark."); *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 & n.1 (2d Cir. 1995); *Zatarain's, Inc. v. Oak Grove Smoke-house, Inc.*, 698 F.2d 786, 791 (5th Cir. 1983); *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1980). Section 1115(b)(4) allows the defense to trademark infringement that

> the use of the name, term or device charged to be an infringement is a use, otherwise than as a mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin.

15 U.S.C. § 1115(b)(4).

We have explained that "the primary cost of recognizing property rights in trademarks is the removal of words . . . from our language." *New Kids*, 971 F.3d at 306. We therefore recognized that the classic fair use defense "in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods." *Id.* (citation and internal quotation marks omitted). "If the trademark holder were allowed exclusive rights in such use, the language would be depleted in much the same way as if generic words were protectable." *Id. See* Restatement (Third) of Unfair Competition § 28 cmt. a ("Trademark rights . . . extend only to the source significance that has been acquired by such terms, not to their original descriptive meanings.").

We consistently have applied the classic fair use analysis to infringement cases involving descriptive marks used in their primary, descriptive sense. In *Cairns*, we cited *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460 (9th Cir. 1993), as a good example of classic fair use. *Cairns*,

292 F.3d at 1151 n.9. In that case, the defendant sold receivers to which two videocassette recorders could be attached and labeled the relevant terminals on the backs of its machines "VCR-1" and "VCR-2." *Dual-Deck*, 11 F.3d at 1462. We concluded that defendant's use of plaintiff's trademark "VCR-2," a descriptive mark that identified plaintiff's two-deck videocassette recorder, was descriptive of defendant's own product. *Id.* at 1467. Because defendant used plaintiff's mark in its primary, descriptive sense and in good faith, defendant's use was not an infringement. *Id.*

Likewise, in *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135 (9th Cir. 2002), we recognized that trademark protection extends only to the secondary, trademark meaning of a descriptive mark, and not to the primary descriptive meaning of the terms. *See id.* at 1143-44. In that case, we concluded that plaintiff's trademark "Entrepreneur" was a descriptive mark that directly identified plaintiff's printed publications. *Id.* We emphasized that, although the plaintiff trademark holder had "the exclusive right to use its *trademark* in printed publications pertaining to business opportunities," the plaintiff "cannot have the exclusive right to use the *word* 'entrepreneur' *in* any mark identifying a printed publication addressing subjects related to entrepreneurship." *Id.* at 1143 (emphasis in the original).[2]

We similarly have allowed classic fair use of a suggestive mark, which carries both an unprotectable primary meaning

---

[2] The Second Circuit illustrated the permissible use of trademarked terms in their primary, descriptive sense with the following example:

> An auto manufacturer's use of the mark SWEET for its cars could not deprive anyone of the right to use that word in good faith in its ordinary descriptive sense and not as a trademark. Thus a candy manufacturer would remain free to advertise the sweetness of its candies without worry about the trademark owner's bridging the gap and going into the candy business.

*Car-Freshner Corp.*, 70 F.3d at 269.

and a protected secondary meaning. *See Brookfield Communications*, 174 F.3d at 1066; *accord Car-Freshner Corp.*, 70 F.3d at 269 & n.1 (explaining that the § 1115(b)(4) classic fair use defense can apply to a mark regardless of its classification as descriptive, suggestive, arbitrary, or fanciful, so long as the mark carried a descriptive primary meaning and a trademarked secondary meaning). In *Brookfield Communications*, we concluded that defendant legitimately could use the term "Movie Buff" in its metatags to denote the term's primary descriptive meaning of "motion picture enthusiast." We emphasized, however, that defendant could not use the plaintiff's suggestive trademark "MovieBuff," which, in its secondary trademark sense, designated the software goods and database services of plaintiff. *Id.* at 1066 (noting that the difference of a single space is "pivotal").

[3] Here, as in *Playboy* and *New Kids*, Jardine does not use the trademark in any primary, descriptive sense. That is, Jardine does not use "The Beach Boys" trademark to denote its primary, descriptive meaning of "boys who frequent a stretch of sand beside the sea."[3] Instead, Jardine uses "The Beach Boys" trademark in its secondary, trademark sense, which denotes the music band — and its members — that popularized California surfing culture. This is true regardless of whether Jardine's use of the mark refers to Jardine himself or

---

[3]Similarly, the defendant newspapers in *New Kids* did not use the trademark "New Kids on the Block" to denote its primary, descriptive meaning of "children who recently moved to this area bounded by streets on four sides." *See New Kids*, 971 F.2d at 308 (stating that defendant newspapers referred to the New Kids to identify them as the subject of telephone polls). Neither did the defendant in *Playboy* use the trademark "Playboy Playmate of the Year" to denote its primary, descriptive meaning, if indeed one exists, of "a companion in games and recreation to a man of means who is given to pleasure-seeking." *See Webster's New World College Dictionary* 1036 (3d ed. 1994); *Playboy*, 279 F.3d at 802 (explaining that defendant used the mark to identify herself as having been named Playboy Playmate of the Year in 1981). Had the defendants in those cases done so, then the classic fair use analysis would have applied.

to the band. Because Jardine does not use the mark in its primary, descriptive sense, the classic fair use defense does not apply.[4]

[4] Where the defendant uses the trademark not in its primary, descriptive sense, but rather in its secondary, trademark sense, the nominative fair use analysis applies. *See New Kids*, 971 F.2d at 308. The nominative fair use defense acknowledges that "it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark." *Id.* at 306. Still, the "core element" of trademark infringement law is "whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product." *Thane Int'l*, 305 F.3d at 901 (internal quotation marks omitted). Therefore, the nominative fair use defense is available only if "the use of the trademark does not attempt to capitalize on consumer confu-

---

[4]We note that the district court found, as an undisputed fact, that Jardine's use of the trademark "caused numerous instances of confusion both with the consuming general public and with the producers of musical events." On appeal, Jardine does not challenge the district court's conclusion that his use of the trademark caused confusion. The purpose of trademark infringement law is to "ensur[e] that owners of trademarks can benefit from the goodwill associated with their marks and that consumers can distinguish among competing producers." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002). Consistent with that purpose, we have held that the classic fair use defense is not available if there is a likelihood of customer confusion as to the origin of the product." *Cairns*, 292 F.3d at 1151 (citing *Transgo, Inc. v. Ajac Transmission Parts, Corp.*, 911 F.2d 363, 365 n.2 (9th Cir. 1990), and *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1248 (9th Cir. 1984)). Therefore, even if the classic fair use analysis applied in this case, the classic fair use defense would not be available because the likelihood of confusion — indeed, the existence of actual confusion — is undisputed. *See Thane Int'l*, 305 F.3d at 902 ("Evidence of actual confusion constitutes persuasive proof that future confusion is likely . . . . If enough people have been *actually* confused, then a *likelihood* that people are confused is established.") (citations and internal quotation marks omitted).

sion or to appropriate the cachet of one product for a different one." *New Kids*, 971 F.2d at 307-308.

[5] In *New Kids*, we articulated the three requirements of the nominative fair use defense:

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Id.* at 308. Just as it is virtually impossible to refer to the New Kids on the Block, the Chicago Bulls, Volkswagens, or the Boston Marathon without using the trademarked names, so too is it virtually impossible to refer to the Beach Boys without using the trademark, and Jardine therefore meets the first requirement. *See id.* & n.7. Also, BRI does not allege that Jardine uses any distinctive logo "or anything else that isn't needed" to identify the Beach Boys, and Jardine therefore satisfies the second requirement. *See id.* at 308.

[6] Jardine fails, however, to meet the third requirement. Jardine's promotional materials display "The Beach Boys" more prominently and boldly than "Family and Friends," suggesting sponsorship by the Beach Boys. *Cf. Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 493 (9th Cir. 2000) (reasoning that promotional materials reduced likelihood of confusion by minimizing references to trademarked name "Steppenwolf"). Also, there is evidence that Jardine uses "The Beach Boys" trademark to suggest that his band is in fact sponsored by the Beach Boys, as Jardine's management testified that they recommended including the trademark "The Beach Boys" in the name of Jardine's band in order to create or enhance marquee value. Finally, Jardine's use of the trademark caused actual consumer confusion, as both event orga-

nizers that booked Jardine's band and people who attended
Jardine's shows submitted declarations expressing confusion
about who was performing.

[7] Because Jardine's use of the trademark suggested spon-
sorship or endorsement by the trademark holder, Jardine's
nominative fair use argument fails.[5] "[T]he plain language of
Rule 56(c) mandates the entry of summary judgment . . .
against a party who fails to make a showing sufficient to
establish the existence of an element essential to that party's
case, and on which that party will bear the burden of proof at
trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The
district court did not err in concluding that Jardine's use of the
Beach Boys' trademark was an infringement. No genuine
issue of material fact exists regarding Jardine's suggestion of
sponsorship or endorsement by BRI. We therefore affirm the
district court's grant of summary judgment in favor of BRI on
BRI's trademark infringement claim. *See Thane Int'l*, 305
F.3d at 901 ("[W]e may uphold a grant of summary judgment
if no genuine issue exists regarding likelihood of confusion.").

## II. Laches

The district court rejected laches as an affirmative defense.
We have applied laches to bar trademark infringement claims

[5]In reaching this conclusion, we note that the third requirement of the
nominative fair use defense — the lack of anything that suggests sponsor-
ship or endorsement — is merely the other side of the likelihood-of-
confusion coin. *See* 2 J. Thomas McCarthy, *Trademarks and Unfair Com-
petition* § 11:47 (4th ed. 2001) (noting "some confusion in the case law as
to whether 'fair use' is really a distinct and separate 'defense' and arguing
that " 'fair use' should be viewed as merely one type of use which is not
likely to cause confusion"). We have held that the nominative fair use
analysis replaces the likelihood-of-confusion analysis set forth in *AMF
Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). *Cairns*, 292
F.3d at 1150. Therefore, whereas plaintiff carries the burden of persuasion
in a trademark infringement claim to show likelihood of confusion, *see
Thane Int'l*, 305 F.3d at 900, the nominative fair use defense shifts to the
defendant the burden of proving no likelihood of confusion.

"only where the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time." *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000) (concluding that objection after two weeks and filing suit after a few months precluded laches defense). Two days after Jardine notified BRI of his intent to tour as "Beach Boys Family and Friends," BRI sent Jardine a letter saying that "[t]he unauthorized use by [Jardine] of the name 'Beach Boys Family and Friends' is a flagrant and serious trademark infringement, and any use of the name would require a license." BRI then filed its complaint in district court five months after receiving Jardine's notification. The district court therefore did not err in rejecting Jardine's laches defense. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 833-34 (9th Cir. 2002) (reviewing laches issue for clear error and abuse of discretion).

## III.  Estoppel

We review a district court's decision to deny equitable estoppel for an abuse of discretion. *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997). Jardine cannot show that he used "The Beach Boys" trademark without knowing that BRI objected to his use. Therefore, we conclude that the district court's rejection of Jardine's equitable estoppel defense was not an abuse of discretion. *See Kierulff v. Metro. Stevedore Co.*, 315 F.2d 839, 842 (9th Cir. 1963) (requiring that party claiming estoppel "acted in ignorance of the matter asserted").

## IV.  Unclean Hands

Jardine contends that the district court erred in concluding that BRI did not act with unclean hands. To prevail on an unclean hands defense, "the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *Levi Strauss & Co.*, 121 F.3d at 1313 (quoting *Fuddruckers, Inc. v. Doc's B.R.*

*Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987)). Jardine fails to point to any evidence, on which a jury reasonably could rely, that BRI acted in any fraudulent or deceitful manner. BRI attempted to negotiate a license with Jardine, but refused to accept Jardine's proposed license agreement because its royalty terms provided less to BRI than those contained in the Love license. The district court therefore did not abuse its discretion in rejecting Jardine's unclean hands defense. *See id.* (reviewing decision to deny unclean hands defense for abuse of discretion).

## V.  Breach of Employment Contract

Jardine contends that the district court erred in concluding that no employment relationship existed between Jardine and BRI. Jardine, however, points to no evidence than an employment contract in fact existed between him and BRI when BRI purportedly breached the contract in 1998 and 1999. Under California law, however, we must examine the totality of the circumstances "to determine whether the parties' conduct, considered in the context of surrounding circumstances, gave rise to an implied-in-fact contract limiting the employer's termination rights." *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1101 (Cal. 2000). Brother Tours, Inc., is the entity through which Jardine, Love, and the other original members of the Beach Boys have conducted their touring and received distributions. If Jardine performed under any employment agreement, the agreement was with Brother Tours, Inc., which is not a party to this action, and not with BRI. This undisputed fact negates the existence of an implied contract between BRI and Jardine. We therefore affirm the district court's grant of summary judgment in favor of BRI on Jardine's counterclaim for breach of employment contract.

## VI.  Breach of License Agreement

The district court concluded that Jardine raised a triable issue of fact as to whether Jardine had a non-exclusive

license, which expired by its own terms on December 31, 1999, to use the Beach Boys trademark. The district court then reasoned, however, that even assuming a license existed, because Jardine toured using the Beach Boys trademark in spite of BRI's objections, Jardine could not show any damages from any purported breach. Jardine contends that, because he toured as "Beach Boys Family and Friends" and not as "The Beach Boys," he earned less income than he would have, had BRI performed under the license agreement and allowed him to tour as "The Beach Boys." Jardine further contends that his damages can be calculated by looking at the amount of touring income Love earned while touring with his own band as "The Beach Boys."

Whether Jardine's "The Beach Boys," touring simultaneously and in competition with Love's "The Beach Boys," would earn as much as a lone "Beach Boys" group is speculative. *See Kids' Universe v. In2Labs*, 116 Cal. Rptr. 23 158, 171-72 (Ct. App. 2002) (reasoning that profits from unlaunched website were speculative because the website would be competing with similar retailers on the same portal). Jardine has not set forth specific facts showing damages with reasonable certainty. *See id.* at 167-68 (requiring that damages for the loss of prospective profits from an unestablished business be shown by evidence of reasonable certainty). We therefore affirm the district court's grant of summary judgment in favor of BRI on Jardine's counterclaim for breach of license agreement.

## VII.  Denial of Jardine's Motion to Amend Pleading

The district court denied Jardine's motion for leave to file an amended pleading adding a counterclaim against BRI and third-party claims against BRI's directors for breach of fiduciary duty. We review a district court's denial of a motion to amend a pleading for abuse of discretion. *Sivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002). Because granting Jardine's motion would have caused an undue delay

in the proceedings, the district court did not abuse its discretion. *See id.* ("The district court may deny a motion for leave to amend if permitting an amendment would, among other things, cause an undue delay in the litigation or prejudice the opposing party."); *Solomon v. N. Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998) (affirming the district court's denial of motion to amend pleadings filed on the eve of discovery deadline).

## CONCLUSION

Because no genuine issue of material fact exists regarding the likelihood of confusion, we affirm the district court's grant of summary judgment in favor of BRI on the trademark infringement claim. We also affirm the district court's grant of summary judgment in favor of BRI on Jardine's counterclaims for breach of contract.

**AFFIRMED.**